IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DOMBKOWSKI,<br><br>   Plaintiff,<br><br> v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>   Defendants.<br>_____/ | No. C 06-5813 CRB<br><br>**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR REMAND AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

  Now before the Court are Plaintiff Michael Dombkowski's Motion for Summary Judgment seeking reversal of the decision of the Social Security Commissioner (the "Commissioner") terminating benefits, or in the alternative seeking remand for further administrative proceedings, and Defendant's Cross-Motion for Summary Judgment seeking affirmation of the Commissioner's decision. For reasons set forth below, the Court GRANTS Plaintiff's motion for remand and DENIES Defendant's cross-motion.

## I. BACKGROUND

**A.**  **Procedural History**

  Plaintiff filed an application for Disability Insurance Benefits under title II of the Social Security Act on April 18, 1996. (Administrative Record "A.R." at 92-95.) Based on this application, Plaintiff was found disabled on the basis of an affective mood disorder with an established onset date of September 30, 1995. (A.R. at 18.)

1    On January 16, 2004, Plaintiff was informed that his disability status was found to
2 have terminated in November 2003 due to medical improvement. (A.R. at 38-41.) Plaintiff
3 requested a hearing after termination of benefits was affirmed on reconsideration. (A.R. at
4 45.) Following the hearing, an Administrative Law Judge ("ALJ") for the Social Security
5 Administration (the "Administration") issued an opinion determining that Plaintiff's
6 disability ceased in November 2003. (A.R. at 16-31.)

**B.    Factual Background**

Beginning in April 1994, Plaintiff was treated for complaints of widespread muscle pain. (A.R. at 17, 166-80.) Because examinations revealed no objective neurological abnormality, varying conclusions were made about Plaintiff's condition, including that he had "an undiagnosed muscle disease," and that he had "myalgia which is normally associated with a very low level of diagnostic specificity." (A.R. at 17-18, 166-80, 242.) In May 1996, Plaintiff underwent a consultative evaluation, which included muscle biopsies. (A.R. at 18, 192-93.) The results of the clinical studies, including the muscle biopsies, were within normal limits. Id.

As early as May 1995, Plaintiff was diagnosed with a somatization disorder. (A.R. at 18, 181-91.) Following the negative results of the muscle biopsies in 1996, Plaintiff underwent a psychiatric consultative evaluation in July 1996. (A.R. at 18, 194-96.) The diagnosis was major depressive disorder, severe, with a reduced Global Assessment of Functioning of 50 to 60. Id. It was also concluded that Plaintiff was "not capable of withstanding the stresses and pressures associated with an eight hour workday or day to day work activity . . . based on his depressed mood and suicidal ideation." Id. Based on these findings, Plaintiff was awarded disability benefits as of September 20, 1995. (A.R. at 18.)

In August 2000, Plaintiff underwent a consultative psychiatric evaluation in connection with the Administration's continuing disability review. (A.R. at 210-13.) On the basis of that evaluation performed by Enrico Balcos, M.D., the Administration determined that Plaintiff's disability was continuing. (A.R. at 33-37.) Plaintiff again underwent a consultative psychiatric evaluation in November 2003. (A.R. at 221-22.) On the basis of

that second evaluation, the Administration determined that Plaintiff's health had improved since the last review and that he was now able to work. (A.R. at 38-41.) Plaintiff's disability benefits were to terminate in January 2004. Id. Plaintiff now challenges the Administration's determination and termination of benefits.

## II.  LEGAL STANDARD

### A.  Standard of Review

The Court's jurisdiction is limited to determining whether the Administration's denial of benefits is supported by substantial evidence in the administrative record or whether the Administration's decision is based on legal error. 42 U.S.C. § 405(g); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); Magallenes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ. Andrews, 53 F.3d at 1039; Magallenes, 881 F.2d at 750. The decision of the ALJ will be upheld if the evidence is "susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1040.

### B.  Termination of Benefits

Once the Administration finds a claimant disabled, a presumption of continuing disability arises. See Bellamy v. Secretary of Health and Human Services, 755 F.2d 1380, 1381 (9th Cir. 1985). While the claimant retains the burden of proof, the presumption shifts the burden of production to the Commissioner to produce evidence to meet or rebut this presumption. Id. Disability Insurance Benefits may not be terminated unless the Commissioner produces substantial evidence demonstrating a medical improvement in a claimant's impairment such that the claimant is able to engage in substantial gainful activity. 42 U.S.C. § 423(f). A medical improvement is defined as any decrease in the medical severity of the impairment that was present at the comparison point decision ("CPD"), *i.e.* the time of the most recent medical decision favorable to the claimant. 20 C.F.R. §

404.1594(b)(1). If the claimant's condition has medically improved and the improvement is related to his ability to work, the Commissioner will consider the claimant's current impairments, which may include new impairments, and determine whether these may, nonetheless, preclude substantial gainful activity. 20 C.F.R. § 404.1594(b)(5).

To assist the ALJ in determining whether there has been any medical improvement, the Social Security Regulations outline the following sequential inquiry:

> (1) Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).
>
> (2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.
>
> (3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)
>
> (4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).
>
> (5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.
>
> (6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

> (7) If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.
>
> (8) If you are not able to do work you have done in the past, we will consider one final step. Given the residual functional capacity assessment and considering your age, education and past work experience, can you do other work? If you can, disability will be found to have ended. If you cannot, disability will be found to continue.

20 C.F.R. §§ 404.1594(f)(1)-(7).

## III.  DISCUSSION

Plaintiff makes the following four claims: (1) the ALJ applied improper legal standards in finding medical improvement and that such finding was not supported by substantial evidence; (2) the ALJ failed to fulfill his duty to develop the record on the issue of the "psychiatric problem" underlying Plaintiff's physical problem; (3) the ALJ failed to credit the opinion Plaintiff's treating physician, Dr. Goldberg; and (4) the ALJ improperly used the Medical-Vocational Guidelines (the "Guidelines") at the final step.  The Court concludes that the ALJ applied the correct legal standard in finding medical improvement and that his finding was supported by substantial evidence.  However, as discussed below, the Court concludes that the ALJ failed to properly develop the record on the issue of the ambiguous evidence relating to Plaintiff's physical limitations.  Because we remand for further development of the record on this issue, the Court does not reach whether the ALJ improperly failed to credit the treating physician's opinion, or whether the ALJ improperly relied on the Guidelines.

**A.    Medical Improvement**

Plaintiff argues that the ALJ's finding of medical improvement was made by applying the incorrect legal standard and was not supported by substantial evidence.  Plaintiff specifically contends that the ALJ erred in rejecting the consistent opinions of treating therapist Philip Beitel, M.F.T., and examining psychologist Dwight R. Murray, Ph.D.

//

//

5

### 1.     The Comparison Point Decision ("CPD")

The ALJ began by looking at the August 2000 psychiatric evaluation conducted by Enrico Balcos, M.D.  (A.R. at 210-13.)  This was the appropriate CPD.  See 20 C.F.R. § 404.1594(b)(1).  Dr. Balcos determined that Plaintiff had a flat affect, psychomotor slowing, depressed mood, hopelessness and suicidal ideation.  Id.  He also opined that Plaintiff's ability to perform simple and repetitive tasks was severely impaired due to "his psychomotor retardation to the point of vegetative state."  Id. at 213.

The ALJ next compared the CPD to the November 2003 findings of psychiatric examiner Robert Hepps, M.D.  (A.R. at 23, 221-22.)  Dr. Hepps concluded that

> [Plaintiff's] disability is primarily physical.  He was apparently severely depressed in the past.  As a result of his current depression and panic attacks, he would have slight difficulty relating appropriately to co-workers and supervisors.  He he [sic] could remember simple instructions and carry them out.  He would have very slight difficulty remembering complex instructions and carrying them out.  He would have very slight difficulty responding appropriately to routine changes in a workplace setting.

(A.R. at 222.)  The ALJ relied on Dr. Hepps's findings that Plaintiff was oriented in all three spheres, that there were no memory deficits, and that his affect and mood were appropriate.  (A.R. at 23.)  He also relied on the fact that "Dr. Hepps found no evidence of any significant psychopathology during his evaluation."  Id.  The ALJ noted Dr. Hepps's observation that Plaintiff was pleasant, cooperative, and answered all questions asked of him.  Id.  Finally, the ALJ commented that Plaintiff's primary care provider, Dr. Goldberg, indicated in an October 2003 medical note that Plaintiff had "full mental capacity to function normally in any situation."[1]  (A.R. at 23, 261.)

Dr. Hepps conducted a complete consultative mental status examination.  See C.F.R. § 404.1519n(c) (listing elements of a consultative examination).  Because Dr. Hepps's conclusions are based on independent findings, the Court is satisfied that his consultative evaluation is substantial evidence indicating medical improvement from the August 2000 CPD with respect to Plaintiff's affective mood disorder.  See Tonapetyan v. Halter, 242 F.3d

---

[1] Yet as the Court will later address, the same medical note indicated that Plaintiff suffered from severe physical limitations.  (A.R. at 261.)

6

1144, 1149 (9th Cir. 2001) (concluding that examining source opinion constitutes substantial evidence because it rests on an independent examination of claimant).

### 2. The Non-Treating and Other Sources

In finding medical improvement, the ALJ also considered and rejected the opinions of psychological examiner, Dwight Murray, Ph.D., and treating therapist Philip Beitel, both of whom concluded that Plaintiff could not engage in substantial gainful activity. (A.R. at 288-94, 309.)

#### a. Dwight Murray, Ph.D.

The controverted opinion of a treating physician may be rejected only for specific and legitimate reasons supported by substantial evidence. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). This same rule applies to the opinions of examining non-treating physicians. Andrews, 53 F.3d at 1041. Where the opinion of an examining non-treating physician differs from the opinion of a treating physician, and is based on independent clinical findings, the opinion of the non-treating physician may itself constitute substantial evidence upon which to reject the treating physician's opinion. Andrews, 53 F.3d at 1041 (citing Magallanes, 881 F.2d at 751). Thus, where the opinions of multiple non-treating physicians conflict with one another, and each opinion is based on independent clinical findings, the ALJ may, *a fortiori*, properly resolve the conflicting opinions by rejecting one or both for specific and legitimate reasons supported by substantial evidence. See id.; see also Tonapetyan, 242 F.3d at 1149 (concluding that examining source opinion constitutes substantial evidence when it rests on an independent examination of claimant).

Dr. Murray conducted a complete psychological examination on Plaintiff. (C.F.R. § 404.1519n(b); A.R. at 288-94.) His conclusions were based on the results of 12 different tests he administered. (A.R. at 288.) Dr. Murray's opinion, therefore, is based on independent findings and may constitute substantial evidence. See Tonapetyan, 242 F.3d at 1149. Nonetheless, the ALJ gave various reasons for rejecting Dr. Murray's opinion. First, the ALJ questioned the multiple diagnoses made by Dr. Murray, including his diagnosis of "Progressive Myotonic Dystrophy" because Plaintiff was never definitively diagnosed with

such an impairment. (A.R. at 20, 193, 242.) The ALJ, in fact, noted that Dr. Goldberg's independent findings led Dr. Goldberg to believe that Plaintiff's physical impairment was severe myalgia. (A.R. at 20, 261, 296). Second, the ALJ noted that while Dr. Murray in July 2005 claimed "[Plaintiff] is not capable of earning a living at this time, strictly from a psychological standpoint," (A.R. at 293), Dr. Goldberg in October 2003 reported that Plaintiff had "full mental capacity to function normally in any situation." (A.R. at 261.) Because Dr. Goldberg, like Dr. Murray, made independent findings, his opinions also constitute substantial evidence and the ALJ properly resolved the conflict between the two opinions. See Andrews, 53 F.3d at 1041; see also Tonapetyan, 242 F.3d at 1149.

The ALJ also questioned Dr. Murray's findings insofar as they were based on Plaintiff's non-credible self-reporting. Plaintiff, for example, once reported to Dr. Sturtz that he had been diagnosed with myotonic dystrophy and that his past muscle biopsies had been abnormal. (A.R. at 224.) To the contrary, Plaintiff's muscle biopsies never revealed any abnormalities. (A.R. at 166, 175, 176, 246-56.) By pointing to specific conflicts between Plaintiff's statements and the objective medical evidence, the ALJ properly undermined Plaintiff's credibility. Morgan v. Comm'r of the SSA, 169 F.3d 595, 602 (9th Cir. 1999). It follows that, the ALJ's rejection of Dr. Murray's opinions insofar as they were premised on Plaintiff's unreliable self-reporting was proper. See id. at 602 (finding that ALJ properly rejected physician's opinion because it was premised on claimant's properly discounted subjective testimony).

Because the ALJ gave specific and legitimate reasons for rejecting Dr. Murray's opinions, and because those reasons are supported by substantial evidence in the record, the ALJ's rejection of Dr. Murray's opinions was proper.

### b.    Philip Beitel, M.F.T.

The ALJ rejected the opinion of Philip Beitel, M.F.T., that Plaintiff "is unable to function vocationally." (A.R. at 309.) The ALJ first noted that Beitel's opinion was not an acceptable medical source under the regulations, but should be considered as an "other source." (See 20 C.F.R. §§ 404.1513(a), (d); A.R. at 21.) The degree of consideration given

to "other source" opinions should be explained by the ALJ. See S.S.R. 06-03p. Among the factors the ALJ can consider in weighing such opinions are the degree to which the source presents relevant evidence and how well the source explains the opinion. See id. Here, the ALJ questioned Beitel's claim that Plaintiff suffered from severe anxiety and dysthymic disorder because he only saw Plaintiff once a month. (A.R. at 21.) Also, the ALJ noted that Plaintiff had been taking the same dosage of Paxil from November 2003 to July 2005, suggesting that Plaintiff's mood symptoms were stable. Id. Finally, the ALJ discounted Beitel's opinion concerning Plaintiff's physical condition because it was outside his practice area. Id.

The Court concludes that the ALJ properly considered Beitel's opinion as an "other source" opinion, gave specific reasons for discounting the opinion, and that those reasons were supported by substantial evidence.

### B. The ALJ's Duty to Develop the Record

Plaintiff next claims that the ALJ failed to discharge his duty to develop the record with respect to his physical condition. He specifically argues that, before ultimately concluding that Plaintiff was no longer disabled, the ALJ had a duty to develop the issue of the effect of Plaintiff's psychiatric problems on his physical state.

An ALJ has a "duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1983) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). This duty exists regardless of whether the claimant is represented by counsel. Brown, 713 F.2d at 443. Ambiguous evidence is one of the events triggering the ALJ's duty to conduct an appropriate inquiry. Tonapetyan, 242 F.3d at 1150. The ALJ may discharge this duty in various manners including subpoenaing the claimant's physicians, submitting questions to the claimant's physician, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. Id.

Here, the ALJ focused on evidence relating to Plaintiff's mental disability. The ALJ can hardly be faulted for doing so because, as he correctly notes, the basis for Plaintiff's

9

disability was that he had an affective mood disorder that prevented him from maintaining pace and persistence in a work setting. (A.R. at 16.) However, according to the sequential inquiry governing medical improvement, after finding medical improvement the ALJ should then have determined whether all of Plaintiff's impairments in combination were so severe as to prevent him from working. See 20 C.F.R. § 404.1594(f)(6). Though the ALJ claims to have done so, (A.R. at 24), he left unresolved ambiguous evidence in the record indicating that Plaintiff has some physical ailment. For example, in the November 2003 disability evaluation that the ALJ used to find medical improvement, Dr. Hepps nonetheless stated that "[Plaintiff's] disability is primarily physical." (A.R. at 222.) Also, while Dr. Goldberg, Plaintiff's primary care physician, opined in October 2003 that Plaintiff has full mental capacity to function normally in any situation, the very next paragraph states

> Physically, he has severe myalgias which limit his ability to work more than a brief time without needing rest. This limits his ability to stand, walk, lift, carry, bend, etc.

(A.R. at 261.) Finally, at the hearing before the ALJ, Dr. West was called upon as a medical expert to testify about Plaintiff's physical impairment. Although Dr. West testified that a diagnosis of myotonic dystrophy was "not well supported," he speculated that a psychiatric problem may explain the physical symptoms. (A.R. at 350.) While Dr. West was not called as an expert on mental impairments, he evidently believed that the best way to resolve the issue was "for the people who made the original positive findings to be [at the hearing]" to testify. (A.R. at 345.) More importantly, subpoenaing Plaintiff's physicians or submitting questions to them are some of the ways the ALJ could have discharged his duty to develop the record on this issue. See Tonapetyan, 242 F.3d at 1150-51 (finding reversible error where ALJ relied on equivocal testimony of medical expert who suggested he would like to see a more detailed explanation from the treating psychiatrist before opining).

Defendant cites Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1999), for the proposition that the ALJ fulfilled his duty to develop the record by leaving the record open so that Plaintiff's attorney could submit some treating notes. To be precise, the ALJ in Tidwell fulfilled his duty after he (1) voiced his concerns to appellant and her counsel about the

inadequacy of the examining physician's check-the-box form in establishing appellant's alleged onset date; (2) requested an additional inquiry into the basis for the examining physician's opinions; and (3) explained that he would keep the record open so that it could be supplemented by the responses from the examining physician. 161 F.3d at 602. In addition, the ALJ's duty in Tidwell was triggered because the ALJ needed to know the basis of the examining physician's opinion in order to reject it. 161 F.3d at 602; see also Smolen, 80 F.3d at 1288 (finding that ALJ had duty to fully develop the record on the underlying bases of physician's opinions before he could properly reject them for clear and convincing reasons). Here, it was the ambiguous evidence of Dr. Hepps and Dr. West that triggered the ALJ's duty to develop the record. Moreover, the ambiguous evidence was not clarified by the treating notes that were submitted after the hearing.

In sum, while Dr. Hepps's opinion seems to indicate medical improvement with respect to Plaintiff's affective mood disorder, the current record is nonetheless ambiguous because both he and Dr. Goldberg continue to note some kind of physical limitation. Though Plaintiff's disability benefits were awarded on the basis of an affective mood disorder, Plaintiff at all times complained of widespread muscle pain indicating that there has always been some physical manifestation of his impairment. And while no objective medical evidence confirms the presence of any physical limitation, such was also the case in 1996 when the Administration first awarded benefits.

## IV. CONCLUSION

The record needs to be developed to explore the physical limitations arising from Plaintiff's mental impairments. Accordingly, Plaintiff's motion for remand is GRANTED and defendant's cross-motion for summary judgment is DENIED. On remand, the Commissioner shall hold further administrative proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: April 26, 2007

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2006\5813\Dombkowski order2.wpd  11